IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOSE JUAN ORGANES-ESPINO,      )
                               )
                Petitioner,    )
                               )      1:13CV577
        v.                     )      1:09CR263-1
                               )
UNITED STATES OF AMERICA,      )
                               )
                Respondent.    )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Petitioner Jose Juan Organes-Espino, a federal prisoner,
filed a motion (Doc. 130), seeking to vacate, set aside, or
correct sentence pursuant to 28 U.S.C. § 2255. On July 27, 2009,
Petitioner was the subject of a one-count indictment charging
him with conspiracy to distribute cocaine hydrochloride in
violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). (Doc. 10.)  An
eight-day jury trial in March of 2010 resulted in a hung jury
and a mistrial was declared. (Minute Entries 03/08/2010-
03/17/2010; 03/17/2010 Oral Order of Mistrial.)

On June 29, 2010, a superseding indictment followed,
charging Petitioner with both the aforementioned drug conspiracy
and with being an illegal alien in the possession of ammunition
in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). (Doc. 45.)

A six-day jury trial ended in conviction on both counts. (Doc. 79; Minute Entries 09/27/2010-10/04/2010.)

On May 6, 2011, Petitioner was sentenced to 324 months of imprisonment. (Minute Entry 05/06/2011; Doc. 110.) After an unsuccessful appeal, United States v. Organes-Espino, 476 F. App'x 543, 545 (4th Cir. 2012), Petitioner then filed the instant motion. (Doc. 130.) The Government filed a response. (Doc. 134.) Petitioner then filed a letter and affidavits (Doc. 138), a reply (Doc. 140), and a supplement (Doc. 141). This matter is now before the court for a ruling. See Rule 8, Rules Governing Section 2255 Proceedings.

## I.   BACKGROUND

The follow witnesses testified at Petitioner's retrial:

### A.   Mark Dwayne Bittle

Mark Dwayne Bittle testified that he was prosecuted in the Middle District of North Carolina in 2007 and convicted of conspiracy to traffic cocaine. (Trial Tr. Day 2 (Doc. 117) at 4-7.) Bittle was a "multi kilo distributor" of cocaine and he named Petitioner as a primary source of supply between 2002 and January of 2007. (Id. at 9-12.) Bittle stated that he obtained approximately thirty kilograms of cocaine from Petitioner per month between 2002 and 2007. (Id. at 25.) Bittle identified

- 2 -

Jorge Escorza Betansos, known as "Coki," as the person who delivered multi-kilograms of cocaine for Petitioner. (<u>Id.</u> at 20-21; Trial Tr. Day 3 (Doc. 118) at 65.) Bittle paid Petitioner between $18,000 and $18,500 per kilogram of cocaine. (Trial Tr. Day 2 (Doc. 117) at 10.)

### B.   **Richard McCane Brower and Jorge Escorza Betansos**

Richard McCane Brower and Jorge Escorza Betansos testified that they were prosecuted in this district in 2007, after they were found in possession of three kilograms of cocaine hydrochloride. (Trial Tr. Day 3 (Doc. 118) at 5, 22-23, 95-98.) Brower identified Petitioner as his supplier of cocaine. (<u>Id.</u> at 9-16.) Brower also identified Betansos as a person who delivered cocaine for Petitioner. (<u>Id.</u> at 17-23.) Between 2003 and his arrest, Brower received twenty-five kilograms per month from Petitioner. (<u>Id.</u> at 16-17.) Brower stated that the three kilograms of cocaine seized from him at the time of his arrest had been supplied by Petitioner and were delivered by Betansos. (<u>Id.</u> at 22-23.)

Betansos testified that he began working for Petitioner on carpentry projects in 2006. (<u>Id.</u> at 108.) He would also drop drugs off at Brower's home or give Bittle drugs "on the street" when Petitioner told him to. (<u>Id.</u> at 99-102, 106-07.)

- 3 -

Petitioner paid Betansos $200 - $500 per delivery. (Id. at 107-08.) Betansos recognized Petitioner's voice on the recordings described elsewhere herein. (Id. at 110-17.) He explained that the two voices (Petitioner's and the voice of a man named Alejandro) were describing drugs, including the price of drugs and the arrival of a particular shipment of drugs. (Id.)

### C.  **Stephen Lamont Booker**

Stephen Lamont Booker testified that he was currently serving a 322-month sentence for a conviction for conspiracy to traffic cocaine and possession of a firearm by a convicted felon. (Trial Tr. Day 4 (Doc. 121) at 47.) Booker identified Petitioner as one of a number of individuals who had delivered twenty-six kilograms of cocaine to Booker and his partner in March of 2008. (Id. at 54-71.) The delivery was made in Greensboro and distributed to various downstream buyers at the same time. (Id.) Booker testified that the money used in the purchase had been vacuum sealed in plastic, and explained that a vacuum sealer looked like an exhibit provided by the Government.[1] (Id. at 68-69.) Booker received $500 per kilogram for selling

---

[1] The exhibit (Gov't Ex. 24) is a picture of the vacuum sealer seized by law enforcement from the building Petitioner claimed to control.

- 4 -

the cocaine and he (Booker) split the money with his partner.
(Id. at 71.) Booker testified that "about three days later, the
same thing transpired" with eleven kilograms of cocaine. (Id. at
71-73.)

### D.   <u>James Randall Hutcherson</u>

James Randall Hutcherson testified that he was a self-
employed general contractor. (Trial Tr. Day 2 (Doc. 117) at 93.)
Hutcherson testified that he built Petitioner's home in Randolph
County. (Id. at 94, 97.) There was no written contract and
Petitioner and his wife paid in cash. (Id. at 95-98.) Hutcherson
also testified that Bittle made an initial payment to buy "stuff
for the foundation." (Id. at 96.) Hutcherson testified further
that he also built Bittle's home for cash and without a
contract. (Id. at 95.)

### E.   <u>Roberto C. Monge</u>

Roberto C. Monge, a bilingual vice narcotics detective with
the City of Greensboro, testified that he listened to and
understood the conversations that took place on the recordings
discussed herein. (Trial Tr. Day 3 (Doc. 118) at 134-35.) Monge
testified further that he had prepared the transcripts presented
in court and that they were accurate. (Id. at 135, 143-45.)

### F.  **Charles Chapeau**

Charles Chapeau, a Georgia state patrolman, testified that
on July 7, 2009, he stopped two vehicles in Georgia on
Interstate 85 upon information of the Atlanta Drug Enforcement
Administration office as they traveled to Greensboro. (Trial Tr.
Day 3 (Doc. 118) at 150-51.) One vehicle contained two adults
and two juveniles. (Id. at 151.) Vanessa Acosta Soberanis was
the female passenger in that vehicle. (Id. at 152.) Twenty-one
kilograms of cocaine were discovered in a false compartment.
(Id. at 152-54.)

### G.  **Christopher Toriello**

Christopher Toriello, a Vice Narcotics Detective with the
Randolph County Sheriff's Office, secured a search warrant to
search Petitioner's home at 7024 Riverside Road on July 8, 2009.
(Trial Tr. Day 4 (Doc. 121) at 5-6.) He testified that a search
of Petitioner's home revealed two firearms and multiple
different kinds of ammunition in the master bedroom of
Petitioner and his wife. (Id. at 8-13.)  A search of an
outbuilding on the property revealed a heat sealer, plastic
wrap, and a plastic bag with "10,000" written on it in black
magic marker. (Id. at 13-21.)

- 6 -

## H. **Matthew Amato**

Matthew Amato, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, testified as an expert witness in the manufacture, origin, and interstate nexus of firearms. (Trial Tr. Day 4 (Doc. 121) at 28-32.) Agent Amato concluded that based on the place of manufacture, all of the ammunition in this case had traveled in interstate commerce. (Id. at 28-37.)

## I. **Daniel Hale**

Daniel Hale, a deportation officer with Immigration Customs Enforcement, testified as to documents indicating that Petitioner had been voluntarily deported from the United States to Mexico in 2004. (Trial Tr. Day 4 (Doc. 121) at 39-43.)

## J. **William Kinghorn**

William Kinghorn, a special agent with the United States Department of Justice, Drug Enforcement Administration, testified that he was the primary agent assigned to Petitioner's case, as well as the cases of Brower and Betansos. (Trial Tr. Day 3 (Doc. 118) at 64-65.) Kinghorn was present on February 8, 2007, when both Brower and Betansos were arrested at Brower's home after having sold nine ounces of cocaine to James Ledwell, who had been arrested earlier that day for the possession of cocaine and was cooperating with law enforcement. (Id. at

- 7 -

65-66.) During an interview with Agent Kinghorn and Brower, Brower identified Betansos as "Coki" and as the person who had delivered three kilograms of cocaine to him that day. (Id. at 69.) Brower also identified Petitioner as Coki's source of cocaine, including at least three kilograms seized that day, and Petitioner's phone number was found on phones seized at Brower's home. (Id. at 69, 84.) Likewise, Agent Kinghorn testified as to Bittle's arrest and indicated that at that time Bittle made a statement identifying Petitioner as his supplier. (Id. at 72-73; Trial Tr. Day 5 (Doc. 122) at 78-79.) Kinghorn also testified that during his investigations, he seized a vacuum sealer or a heat sealer and that such an item is commonly found in residences searched for drugs. (Trial Tr. Day 3 (Doc. 118) at 86.)

Moreover, Agent Kinghorn testified that he was present during an interview with Petitioner on March 10, where Petitioner stated under oath that he was born in Mexico. (Id. at 90.) Petitioner further stated during the interview that he had been sent back to Mexico twice after entering the United States illegally and stated further that he was currently in the country illegally. (Id. at 91-92.)

Finally, Kinghorn coordinated and worked with agents from the Drug Enforcement Administration office in Atlanta, Georgia, and he received from them certain recordings obtained pursuant to a court-authorized wiretap. (Id. at 73.) The Atlanta office was investigating an individual known as Alex, Alejandro Soberanis, who had been identified as a source of multiple kilograms of cocaine that had been seized. (Id.) Kinghorn also testified that he had received and reviewed the authorized wiretap recording involving Alejandro Acosta Soberanis. (Id. at 73, 79.) Kinghorn also identified a picture of Soberanis' sister, Vanessa Acosta Soberanis. (Id. at 80.)

### K.    Petitioner Jose Juan Organes-Espino

Petitioner testified that he was a carpenter and that he did construction work for a living, which for the most part involved building large "chicken houses" for poultry. (Trial Tr. Day 4 (Doc. 121) at 103, 117.) Petitioner admitted knowing Betansos and said Betansos worked for him building these chicken houses from mid-2005 to mid-2006. (Id. at 119-20.) Petitioner denied having Betansos deliver drugs. (Id. at 120.) Petitioner also admitted that it was his voice on the wiretap in July of 2009. However, Petitioner contended that he was trying to strike a deal with Alejandro (who owned a clothing store) to purchase

cheap clothing for resale because "the economy had come down, and there was very little work." (Id. at 122-23, 128-35.)

Petitioner admitted knowing Bittle. (Id. at 135.) However, Petitioner denied dealing drugs to him. (Id.) Petitioner admitted knowing Brower because Brower was a neighbor of his in Asheboro back in the late 1990's. (Id.) However, Petitioner denied selling drugs to Brower. (Id. at 136.) Petitioner further testified that he saw Booker in the Alamance County Jail and that "the four witnesses or five witnesses were in another cell together laughing at me." (Trial Tr. Day 5 (Doc. 122) at 77.)

Petitioner also testified that his mother-in-law, who was a school teacher, paid for the pool in his backyard and Petitioner stated that he did not know how much it cost. (Trial Tr. Day 4 (Doc. 121) at 147-48.) Petitioner further testified that "the owners [for whom he did carpentry work] would sometimes give [him] checks for [$]20,000 or [$]15,000 or $10,000." (Id. at 151.) Petitioner stated that there were contracts for all this work and that his wife was in charge of those. (Id.) Petitioner also testified that he had never been convicted of a crime punishable by more than one year of imprisonment. (Id. at 146.)

- 10 -

**L.   Clifford Laihben**

Clifford Laihben testified that he was in custody at the Hillsborough County Jail and had pending federal charges. (Trial Tr. Day 4 (Doc. 121) at 157-58.) Laihben testified that he knew Bittle, Betansos, and Brower. (Id. at 158.) Laihben testified that in January of 2010, he was in Alamance County Jail with all three men in the same dorm and that the three men were sitting in front of a blue piece of paper with "some sort of map" on it. (Id. at 159.) Laihben testified that he overheard Bittle saying to Betansos, "look, you know, we're going to have to get our testimony straight.  We're going to have to keep it simple, and we've got to all go in there, and we've got to be saying the same shit." (Id. at 160.) Laihben further stated that Bittle said, "so what's going to be your testimony? And then he asked Mr. Brower, what's going to be your testimony? So they were setting whatever – they were putting their plot together right there at the table." (Id.)

Laihben admitted that he was awaiting sentencing in this district. (Id. at 161.) Laihben admitted to signing a plea agreement on August 21, 2007. (Id. at 167, 169, 171.)  He admitted that the plea agreement stated he would "enter a voluntary plea of guilty to the superseding indictment herein."

(Id. at 171.) Laihben admitted further that the superseding indictment charged him with conspiring to make, possess, and utter counterfeit securities; of using counterfeit credit cards; of obstructing justice; of tampering with a witness; and of suborning perjury. (Id. at 166-67.) Laihben also admitted to prior convictions of robbery and conspiracy to make false statements to a licensed firearms dealer. (Id. at 171-72.)

### M. Alison Boyd

Allison Boyd testified that he was in Alamance County Jail on or about January 31, 2010. (Trial Tr. Day 5 (Doc. 122) at 12.) He testified that he heard a conversation in English between Bittle, Betansos, and Brower. (Id. at 12, 17.) Boyd testified, "I heard Mark Bittle [say] they better get their shit together if they want to go home. It's either Johnny or us. And Richard Brower said, well, it got to be Richard because I got money in those streets and women to sleep with . . . ." (Id. at 12-13.) After Petitioner's counsel inquired further, Boyd said, "It's got to be Johnny, Johnny, Johnny, excuse me." (Id. at 13.) Boyd also admitted that he had pending charges for being a felon in possession of a firearm, to which he had pled guilty, and to having a prior felony conviction for conspiracy to interfere

- 12 -

with commerce by threat of violence. (Id. at 13-15.) Boyd also stated that he was threatened not to testify. (Id. at 25.)

### N.    **Character Witnesses**

Petitioner also called six character witnesses. (Trial Tr. Day 5 (Doc. 122) at 27-41, 47-74.) All these witnesses were either related to Petitioner or had construction work performed by him, or both. They all testified that Petitioner had a good reputation in the community and was honest. (Id. at 27-35.)

## II.  **PETITIONER'S CLAIMS**

Petitioner first contends that counsel was ineffective for failing to file a motion to suppress. (Petition (Doc. 130), Ground One.) Petitioner next asserts that counsel was ineffective for failing to call his wife as a witness at trial. (Id., Ground Two.) Third, Petitioner alleges ineffective assistance at sentencing. (Id., Ground Three.) As explained below, none of these grounds[2] has merit.

## III. **DISCUSSION**

### A.    **Ground One**

Petitioner's first ground is that counsel was ineffective for failing to file a motion to suppress. To prove ineffective

---

[2] Petitioner also asserts ineffective assistance of appellate counsel for failing to raise these issues on appeal.

- 13 -

assistance of counsel generally, a petitioner must establish:
(1) that his attorney's performance fell below a reasonable
standard for defense attorneys, and (2) that he was prejudiced
by this performance. See Strickland v. Washington, 466 U.S. 668,
688, 694 (1984). With respect to the first prong, the petitioner
bears the burden of affirmatively showing that his counsel's
performance was deficient, that is, that the performance fell
below an objective standard of reasonableness under prevailing
professional norms. Id. at 688-89; Spencer v. Murray, 18 F.3d
229, 233 (4th Cir. 1994). With respect to the second prong, the
petitioner must show that prejudice resulted from the deficient
performance, that is, that there is a reasonable probability
that but for counsel's unprofessional errors, the result of the
proceeding would have been different. Strickland, 466 U.S. at
694. A reasonable probability is one "sufficient to undermine
confidence in the outcome." Spencer, 18 F.3d at 233 (citing
Strickland, 466 U.S. at 694).

Claims of ineffective assistance of counsel on appeal are
also judged using the Strickland test. See Lawrence v. Branker,
517 F.3d 700, 708-09 (4th Cir. 2008). Appellate counsel need not
raise on appeal every non-frivolous issue requested by a defendant.
Evans v. Thompson, 881 F.2d 117, 124 (4th Cir. 1989). Ineffective

- 14 -

assistance of appellate counsel can be shown by demonstrating that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Bell v. Jarvis</u>, 236 F.3d 149, 180 (4th Cir. 2000).

Petitioner contends that trial counsel was ineffective for failing to suppress evidence seized by law enforcement from 7032 Riverside Road in the form of "[b]ank straps with $10,000 written on them, a heat sealing vacuum machine and rolls of plastic wraps." (Petition (Doc. 130), Ground One at 5.) Petitioner concedes that the Government had "secured a search warrant that authorized the search of [P]etitioner's home at

7024 Riverside Rd."[3] (Id.) However, he continues, the aforementioned evidence was found at an adjoining property, 7032 Riverside Road, which Petitioner contends he used as a gym. (Id.) Petitioner contends further that this evidence was used at trial "to convey to the jury that [he] had a substantial money counting and drug packaging operation in the gym." (Id.)

---

[3] In a February 2014 reply and a March 2014 supplement, Petitioner also argues he is entitled to the suppression of evidence seized from his home, 7024 Riverside Road. (Pet'r's Reply (Doc. 140) at 8; Pet'r's Suppl. (Doc. 141) at 9.) Petitioner did not raise this new claim in a properly filed motion to amend and he has not sworn to his new allegation in an affidavit. This argument is also likely time-barred as it was first raised after the expiration of the one-year limitations period and is considerably different than Petitioner's original timely claim, raised in July of 2013, involving 7032 Riverside Road. (Petition (Doc. 130) Ground One.) In any event, the new claim fails for being vague, conclusory, and unsupported. Nickerson, 971 F.2d at 1136. This is because Petitioner asserts that agents arrested him in the morning and then began the search of 7024 Riverside Road without a warrant, but Petitioner also concedes a warrant arrived in the early afternoon. (Pet'r's Suppl. (Doc. 141) at 9.) Petitioner does not assert that any evidence was seized during the purported morning search of 7024 Riverside Road or that anything from this purported search was used to secure the search warrant that soon arrived. Instead, the only material evidence on the record regarding the seizure of evidence from 7024 Riverside Road is the unchallenged and unrebutted testimony of Detective Toriello that he "read the search warrant to Ms. Brower-Organes who was present in the residence" and that during the search, law enforcement netted the ammunition later used to convict Petitioner on Count Two. (Trial Tr. Day 4 (Doc. 121) at 6-13.) This testimony remains uncontested. For all these reasons, these new allegations provide Petitioner no relief.

- 16 -

Here, although Petitioner's counsel did not file a motion to suppress pre-trial, at trial counsel sought to exclude this evidence from being used. Specifically, during Detective Toriello's testimony, Petitioner's counsel objected to the admission of a picture of the heat sealer as follows:

BY MS. HAIRSTON:

Q.   Officer Toriello, let me show you this item marked for identification as Government's 24 and ask you if you recognize that, sir.

A.   I do.

Q.   How do you recognize it?

A.   This was also evidence that was seized during the execution of the search warrant.

Q.   Where was it found?

A.   This item, it was found in an outbuilding/gym area, basically if you took an outbuilding, you put some exercise equipment in it and some other storage items. This was actually inside that building that was on the property.

    MS. HAIRSTON:  All right. We move the admission of Government's 24, Your Honor.

    MR. JOHNSON:  Objection.

    . . . .

    THE COURT:  Well, let me send the jury back for a minute.

    . . . .

- 17 -

THE COURT:  All right. . . . [Y]our contention
is, Mr. Johnson, that the search warrant didn't extend
to cover the outbuilding or this gym building? Let me
get you to state your objection again for the record.

MR. JOHNSON:  Yes, Your Honor. Our objection
would be that this -- these items were seized from an
outbuilding that was excluded or not within the
property line, if Your Honor please, covered by the
search warrant.

. . . .

THE COURT:  All right. . . . So your contention
is the warrant identifies 7024 Riverside Road in
Seagrove as the property to be searched, and you now
contend that this outbuilding that was searched is not
located on 7024 -- 7024 Riverside Road in Seagrove?

MR. JOHNSON: Yes, Your Honor.

. . . .

THE COURT: . . . that does raise kind of a tricky
question here. I just checked back in my notes, and
this objection was not raised during the course of the
first trial; and even in the absence of any objection
being raised, Mr. Organes was specifically asked about
plastic and the heat sealer and various other things
and contended that they had just killed a pig for --
and used that -- those items for -- to save the meat
and distribute it around.

Now, I know that evidence is not in the record at
this point in this case, but at least for purposes of
trying to rule on your objection, that is, to exclude
the evidence, it seems to me there's just nothing to -
- there's nothing to support any finding that that
outbuilding was not on the property. If I say, well,
it wasn't on the property and he doesn't have standing
and, therefore, it's irrelevant, it seems to me that
he's describing what they did in conjunction with the
search at this point. If there's a relevancy issue,
that can be addressed on cross-examination, and I

- 18 -

think the Government then would be entitled to respond that defendant's previously contended under oath that these are, in fact, his items.

　　　MR. JOHNSON: Yes, Your Honor.

　　　. . . .


　　　MR. JOHNSON: Yes, Judge. I con -- we concede that he has no standing to suppress any search on other property with regard to a search warrant on that property, Judge. And with regards to items seized pursuant to search warrant on 7024, if Your Honor please, we don't perceive nothing that the search warrant was irregular or have never contested that. It's just an evidentiary matter that my client wanted me to address. I brought it up, Judge. If -- it may resolve itself later in the proceedings, Your Honor, as Your Honor stated. The evidence has been my client has testified. He may testify in this case -- in this -- this hearing.

　　　THE COURT: It seems to me if I turn to the initial objection and consider your present contention that the outbuilding is located off of the 7024 property, and it seems to me if it's located off the property, then we're talking about a relevance objection more than anything else.

　　　MR. JOHNSON: Yes, Your Honor.

　　　THE COURT: As Ms. Hairston points out, there is testimony from Mr. Brower talking about using a building that's away from the house, or at least a trailer, and I don't -- it seems to me it's fair for me to consider the fact that Mr. Organes testified last time that items found in that -- same items that we're talking about now were items that he used, which would -- maybe it is off the -- off the property proper, so to speak. Maybe it does fall outside the actual lines of the property. But in the face of his prior admission -- for purposes of considering this issue outside the presence of the jury, in the face of

- 19 -

a prior admission that these were his items used to -- used to package leftover pig from the party or the celebration that they've had, I'm -- I don't -

MS. HAIRSTON: Your Honor, could I offer - could I offer this suggestion? The Government would offer the -- I think that's Exhibit 24 that Officer Toriello has just identified. The Government would offer to show him the other exhibits that have been marked and have them identified, and I would postpone my motion for admission at this time until the Government's case in rebuttal.

THE COURT: I'll certainly permit you to -- I'll let you try your case anyway you want to -

MS. HAIRSTON: Yes, sir.

THE COURT: -- but I think I'm -- at this point we'll -- I'll let the testimony stand. I'm not going to strike any testimony at this point based on the objection that's been rendered. I think -- I think it's a little late for that, and I think it's a little -- I think from a merit standpoint, given the defendant's prior statements about the property, I think it's -- it should be -- I'll let the testimony stand and overrule the objection at this point.

(Trial Tr. Day 4 (Doc. 121) at 13-19.)

Immediately after this, the Government presented Exhibit 22 (rolls of cellophane paper) and Exhibit 23 (plastic wrapping with "10,000" written on it in black magic marker). (Id. at 20-21.) Detective Toriello testified that both Exhibits were found "in the same outbuilding/gym that the heat sealer [Exhibit 24] was found." (Id. at 20.) Petitioner's counsel did not cross-

- 20 -

examine the detective as to Exhibits 22-24. (<u>Id.</u> at 26-27.)
Exhibits 22-24 were never admitted into evidence. (<u>Id.</u> at 95.)

Consequently, although counsel did not move to suppress the
evidence in question, he did raise Petitioner's objection to the
admission of evidence seized from the outbuilding. Petitioner
now faults counsel for not raising this objection sooner and for
not asserting it differently. Petitioner's affidavit asserts
that "[t]he adjacent building, 7032 Riverside Rd., was a gym
that was controlled and used by me to store tools." (Affidavit
of Jose Juan Organes-Espino ("Jose Organes Aff.") (Doc. 138) at
2.) He states further that:

> 6) I saw police checking the mailboxes and taking
> garbage from the trash cans in front of both of
> these premises.
>
> 7) The police knew that 7032 Riverside Rd. was a
> separate property from 7024 Riverside Rd. yet
> failed to get a search warrant for 7032 Riverside
> Rd.
>
> 8) The police searched 7032 Riverside Rd and found
> Bank straps with $10,000 written on them; a heat
> sealing vacuum machine; and rolls of plastic
> wraps.
>
> 9) This evidence was used at trial to convey to the
> jury that I had a substantial money counting and
> drug packaging operation in the gym.
>
> 10) This evidence was critical in bringing about my
> conviction but defense counsel, Thomas Hilton
> Johnson, Jr. Esquire, did not seek to properly
> suppress this evidence.

- 21 -

(Id. at 2-3.)

These statements, however, are insufficient to warrant relief because vague, conclusory, and unsubstantiated statements like this do not meaningfully explain how Petitioner had control over the outbuilding in question sufficient to give him standing to contest the search.[4] See Alderman v. United States, 394 U.S. 165, 171-72 (1969); Nickerson v. Lee, 971 F.2d 1125, 1136 (4th Cir. 1992), abrog'n on other grounds recog'd, Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999).

And, even assuming Petitioner had standing to contest the search of the outbuilding adjacent to his home, and even assuming further that counsel's decision not to file a motion to suppress was objectively unreasonable, Petitioner has still failed to demonstrate prejudice. This is because the presentation and identification of the evidence described above, which was never admitted into evidence, was only one small part of a large body of evidence of Petitioner's guilt. In other words, the court agrees with the Fourth Circuit Court of Appeals

---

[4] Petitioner's pleadings assert that either he or his wife or perhaps both had rented out the adjacent property from "Larry McSwain." (Pet'r's Reply (Doc. 140) at 9; Pet'r's Suppl. (Doc. 141) at 10.) Petitioner never mentions this in his sworn affidavits. And, even if he did, his claim would still fail for lack of prejudice as explained below.

that the evidence of Petitioner's guilt here was "overwhelming."
Organes-Espino, 476 F. App'x at 545.

By way of non-exhaustive examples, Bittle, Brower, Betansos, and Booker all testified at length about their conspiracy to traffic in cocaine with Petitioner. Phone recordings likewise implicated Petitioner in the trafficking of cocaine.  There was also the question of Petitioner's finances, including a home he purchased with cash and a swimming pool he attributed as a gift from his mother-in-law, a retired school teacher.

It is true that Laihben testified about a conspiracy to frame Petitioner. However, Laihben's testimony was as likely to have harmed Petitioner as it was to have helped him, given Laihben's history of crimes involving dishonesty. This left the testimony of Boyd, who testified consistently with Laihben, and a number of character witnesses, most of whom were related to Petitioner. After considering all this evidence, the jury found Petitioner to be guilty. The court concludes that the scattered references at trial to the evidence in question (Exhibits 22-24) were insufficient to prejudice Petitioner.

For these reasons, the court concludes that trial counsel was not constitutionally ineffective for failing to file a

motion to suppress.[5]  As such, Petitioner's first ground for relief lacks merit and will be denied.

**B.**    **Ground Two**

Next, Petitioner contends that counsel was ineffective during trial for failing to call his wife, Tressa Organes, as a witness. (Petition (Doc. 130), Ground Two.) Petitioner contends that his wife's testimony would have demonstrated "proof of purchase" of two handguns and that he "had no involvement in the use or ownership of the said weapons."  (Id. at 7.)

Petitioner has also filed an affidavit stating:

> 11)  I requested trial attorney, Thomas H. Johnson, Esquire, to call Tressa Organes to testify on my behalf.

> 12)  Tressa Organes had extensive financial records to prove my source of income.

> 13)  Tressa Organes had legally purchased two handguns both of which substantiated my conviction on count two of the indictment.

> 14)  Tressa Organes was prepared to provide proof of purchase of these weapons and testify that I had no involvement in the use or ownership of the said weapons.

---

[5] Given that appellate counsel is not obliged to raise meritless claims on appeal, any ineffective assistance of appellate counsel iteration of this argument fails as well. See Foote v. Solomon, No. 1:14CV877, 2015 WL 5674903, at *11 (M.D.N.C. Sept. 25, 2015), appeal dismissed, No. 15-7759, 2016 WL 1321154 (4th Cir. Apr. 5, 2016).

- 24 -

15)  Tressa Organes was also prepared to testify that
     I did not conduct any drug transactions to her
     knowledge.

16)  Tressa Organes would testify as to how she took
     possession of the property at 7024 Riverside Rd.

(Jose Organes Aff. (Doc. 138) at 3.)

Petitioner's wife has also filed an affidavit that, in

pertinent part, states:

4)   I have extensive financial records of Organes
     Builders to prove Jose Juan Organes's sources of
     income.

5)   I had legally purchased the handguns that Jose
     Juan Organes was convicted for and Jose Juan
     Organes neither possessed nor had control over
     the said guns.

6)   I was prepared to testify at Jose Juan Organes's
     trial that the guns were mine and provide
     documentary proof of this.

7)   I would have testified at Jose Juan Organes's
     trial as to how I acquired the property at 7024
     Riverside Rd.

(Affidavit of Tressa Organes (Doc. 138) at 5.)

Counsel, in turn, has responded to this ground in an

affidavit stating the following:

This claim is frivolous. When preparing for the first
trial [Mrs. Organes] was reluctant to testify. She
stated she was preparing for her exams at the
community college she was attending. After her exams
were over, I attempted to prepare her and go over the
questions I would ask in the direct examination in
trial, she could not or would not answer the simplest
of questions. She would not respond, then feigned a

- 25 -

headache due to her head injury from a car accident
that occurred years ago. The odd point was as soon as
I stopped asking her questions about her testimony,
she could carry on a conversation about anything. I
explained this to the Petitioner when I visited him to
prepare for trial. I tried to explain to him and show
him how to present the evidence on his business
without her testifying because she was a problem. He
refused to listen to me and kept hoping she would
testify that she handled the records of their
business. He could have testified to the records if he
listened to counsel. The owner, president or CEO of a
business can testify about the records of the
business, so long as they can lay the proper
testimonial foundation. He did not want to, he was
stubborn. The Petitioner's wife's father retained me
to be her counsel when she was served with a notice
for a civil deposition by the Government. She chose to
go without my presence or assistance there. The
petitioner's wife Mrs. Tressa Organes also told me to
subpoena a witness to testify for the petitioner, on
the basis that he would corroborate the petitioner's
testimony. However, I did not call that witness
because he would have contradicted the petitioner's
testimony and I told the Petitioner that I was not
calling the witness for that reason during the trial.

(Gov't Resp., Ex. A (Doc. 134-1) at 1-2.)

For the following reasons, this ground lacks merit.

### 1.   The Firearms

First, Mrs. Organes indicates she would testify that her

husband did not possess or have control over firearms. However,

Petitioner was not convicted of possessing firearms, but of

possessing ammunition. (Superseding Indictment (Doc. 45), Count

Two.) The affidavits Petitioner has provided do not address the

ammunition in question and so therefore any testimony consistent

- 26 -

with those affidavits would have had, at best, a marginal impact

on the trial. Counsel therefore was not objectively unreasonable

in declining to call Mrs. Organes to testify as to the firearms.[6]

### 2. 7024 Riverside Road

Second, both affidavits supplied by Petitioner indicate

that Mrs. Organes was willing to testify as to how she took

possession of the property at 7024 Riverside Road. However,

nowhere does either Petitioner or his wife explain the details

of that purported transaction. Likewise, both affidavits state

that Mrs. Organes had extensive financial records to prove

Petitioner's sources of income. Yet, as noted by counsel,

Petitioner could presumably testify as to his own sources of

---

[6] A conviction for possession of ammunition by an illegal
alien requires knowing possession of the ammunition in question.
18 U.S.C. § 922(g)(5). Possession may be actual or constructive.
United States v. Robinson, 13 F. App'x 193, 194 (4th Cir. 2001).
There is constructive possession of an item when one knows of
its presence and exercises or has the power to exercise dominion
and control over it. See United States v. Scott, 424 F.3d 431,
435 (4th Cir. 2005). Possession may be established by
circumstantial evidence. United States v. Al Sabahi, 719 F.3d
305, 311 (4th Cir.), cert. denied, ____ U.S. ____, 134 S. Ct.
464 (2013). As noted, the ammunition in question here was found
out in the open in Petitioner's bedroom. Sufficient evidence was
presented to the jury that Petitioner exercised dominion and/or
control over it, or had the power to exercise dominion and/or
control over it. The testimony of Mrs. Organes would not change
this.

income,[7] and, even setting that aside, both Petitioner and Mrs. Organes fail to explain in any meaningful detail exactly what these records contained or demonstrated. Again, vague, conclusory, and unsupported allegations warrant no relief. See Nickerson, 971 F.2d at 1136.

### 3. Drug Transactions

Third, Petitioner's affidavit asserts that his wife was willing to testify at trial that "to her knowledge" Petitioner never conducted any drug transactions. However, nowhere in Mrs. Organes' affidavit does she state anything to this effect. Consequently, this assertion is vague, conclusory, and unsubstantiated as well. See Nickerson, 971 F.2d at 1136. Moreover, given the overwhelming evidence of Petitioner's guilt described elsewhere herein, there is no reason to believe that even if Mrs. Organes had testified along these lines, the jury would have reached a different conclusion.

### 4. Mrs. Organes' Willingness to Testify

Fourth, while the affidavits of Petitioner and his wife stated that she was "prepared" to testify, they do not respond to or rebut counsel's detailed description of Mrs. Organes'

---

[7] See, e.g., United States v. Cook, Civil Action No. 3:14-7371-DCR, Criminal Action No. 3:11-06-DCR-02, 2015 WL 4425878, at *15 (E.D. Ky. July 20, 2015).

- 28 -

"reluctance" to testify or counsel's explanation as to why she would be a poor witness. Counsel's detailed explanation about all this gave rise to counsel's conclusion that Mrs. Organes was as likely to hurt her husband at trial as help him. In other words, had counsel called Mrs. Organes, or the unnamed witness she identified, at trial and had the trial testimony gone as anticipated by counsel as described above, it may have harmed Petitioner.[8] Petitioner has failed to meaningfully contest counsel's reasonable and strategic decision not to call Mrs. Organes or her witness.[9]  For all these reasons, Petitioner's second ground for relief will be denied.

### C.   **Ground Three**

Last, Petitioner contends that "[c]ounsel was ineffective for failing to raise an Apprendi claim." (Petition (Doc. 130), Ground Three). Apprendi v. New Jersey, 530 U.S. 466, 476 (2000) held that, other than the fact of a prior conviction, any fact

---

[8] Petitioner raised a similar claim at sentencing by way of a motion for substitute counsel in which he referenced counsel's refusal to call Mrs. Organes at trial. Counsel explained that he told Mrs. Organes the last day of trial that he did not trust her and that she wanted him to call a witness that would be "devastating" to Petitioner's case. (Sentencing Tr. (Doc. 120) at 9-10.)

[9] Again, because trial counsel did not err, any ineffective assistance of appellate counsel iteration of this argument fails as well. See Foote, 2015 WL 5674903, at *11.

that serves to increase the statutory maximum penalty for an offense must be submitted to the jury and proven beyond a reasonable doubt. Id. Alleyne v. United States, ____ U.S. ____, 133 S. Ct. 2151, 2155 (2013) held that facts that increase the statutory mandatory minimum sentence must also be submitted to a jury and proven beyond a reasonable doubt. Id. Alleyne concluded that this "[did] not mean that any fact that influences judicial discretion must be found by a jury." Id. at 2163 (citation omitted).

Here, Petitioner's Apprendi/Alleyne ground lacks merit. In pertinent part, the indictment in this case alleged a violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) in Count One. (Superseding Indictment (Doc. 45), Count One.) Specifically, the superseding indictment charged that Petitioner conspired with "divers other persons" to distribute "5 kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride . . . ." (Id.) The jury returned a verdict with a specific finding that Petitioner was "Guilty of the crime charged in Count One of the Indictment," and that the amount of cocaine hydrochloride he conspired to distribute was "[m]ore than Five Kilograms." (Verdict (Doc. 79).) Thus, there was no Apprendi error and counsel's performance was reasonable.

Regarding Petitioner's sentence, the court imposed a sentence at the low end of the correctly calculated advisory guidelines range. (PSR ¶ 64.) Petitioner received one adjustment, for his role in the offense, pursuant to USSG § 3B1.1(b), which was upheld on appeal. (PSR ¶ 25.) See Organes-Espino, 476 F. App'x at 546.

Finally, Alleyne does not support a claim of ineffective assistance of counsel during sentencing. Petitioner's sentence of 324 months of imprisonment did not, as he contends, result from his mandatory minimum sentence being increased from "10 years to 30 years." (Petition (Doc. 130) at 10.) Petitioner was sentenced to the low end of the applicable advisory guidelines range – 324 months to 405 months of imprisonment. See USSG Ch. 5, Pt. A, Sentencing Table (2010) (Total Offense Level 41, Criminal History Category I). The 324-month sentence was not a statutory mandatory minimum penalty and it does not amount to a

- 31 -

30-year sentence. (PSR ¶ 64; Sentencing Tr. (Doc. 120) at 44).[10]
This ground lacks merit and will therefore be denied.[11]

## IV.    CONCLUSION

For the foregoing reasons, Petitioner's motion lacks merit
and should therefore be denied and dismissed.  Neither
discovery, an evidentiary hearing, nor the appointment of
counsel is warranted in this matter.

**IT IS THEREFORE ORDERED** that Petitioner's Motion under 28
U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc.
130) is **DENIED** and that this action be dismissed.

A judgment dismissing this action will be entered
contemporaneously with this Memorandum Opinion and Order.
Finding no substantial issue for appeal concerning the denial of
a constitutional right affecting the conviction, nor a debatable
procedural ruling, a certificate of appealability is not issued.

---

[10] There being no error at sentencing, any ineffective
assistance of appellate counsel iteration of this argument
fails. See Foote, 2015 WL 5674903, at *11.

[11]  Petitioner also argues that the guidelines in effect at
the time he committed his crime control. Generally, a convicted
defendant's sentence is based upon the guidelines manual in
effect on the date of sentencing. USSG § 1B1.11(a)(2010).
Petitioner has failed to raise a non-conclusory or meritorious
argument that he falls into an exception to this rule or that
there was some form of ex post facto violation at sentencing.

This the 25th day of August, 2016.

_____
United States District Judge